[No. D002237. Fourth Dist., Div. One. May 13, 1986.]

AUGUST S. CARSTENS, Plaintiff and Appellant, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent;
SOUTHERN CALIFORNIA EDISON COMPANY et al.,
Real Parties in Interest and Respondents.

## COUNSEL

Richard J. Wharton for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Anthony M. Summers, Deputy Attorney General, for Defendant and Respondent.

Orrick, Herrington & Sutcliffe, David R. Pigott, David W. Alden, Tomme R. Young and Charles R. Kocher for Real Parties in Interest and Respondents.

## OPINION

**WIENER, J.**—August S. Carstens (Carstens) appeals the denial of his petition for writ of mandate seeking judicial review of the California Coastal Commission's (Commission) decision approving an amendment to a coastal development permit issued to Southern California Edison and San Diego Gas & Electric (SCE)[1] in 1974 for construction of units 2 and 3 of the San Onofre Nuclear Generating Station (SONGS). ■ ■ ■ ■ The amendment modified conditions relating to beach access in conflict with safety measures required by the Nuclear Regulatory Commission (NRC).[2] We affirm the judgment.

---

[1]After Southern California Edison Company and San Diego Gas & Electric Company acquired the easement for construction of SONGS, the cities of Riverside and Anaheim obtained partial interests in units 2 and 3. All four entities are the real parties in interest.

[2]Federal preemption is not at issue in this case. State regulation of nuclear power plants is preempted only with respect to direct regulation of radiation hazards. (*Pac. Legal Found.* v. *State Energy Resources, etc.* (9th Cir. 1981) 659 F.2d 903, 921, cert. den. 457 U.S. 1133 [75 L.Ed.2d 752, 103 S.Ct. 1713].) The Commission has not attempted to regulate preempted matters.

FACTUAL AND PROCEDURAL BACKGROUND

In May 1964 the Department of the Navy granted a 60-year easement to SCE for use of the San Onofre site for construction and operation of a nuclear generating station. The seaward boundary of the federal government's property and SCE's easement is the mean high tide line. The SONGS site is bounded on the north and south by San Onofre State Beach, a portion of the Camp Pendleton reserve leased to the State of California for recreational purposes. Unit 1 of SONGS has been in operation since 1968.

After obtaining licenses from the United States Atomic Energy Commission for construction of two additional units at SONGS, SCE applied to the San Diego Coast Regional Coastal Commission for a permit to construct, operate and maintain SONGS units 2 and 3 pursuant to the California Coastal Zone Conservation Act of 1972.[3] (Pub. Resources Code, §§ 27000-27650.) The California Coastal Zone Conservation Commission issued coastal development permit No. 183-73 for units 2 and 3 on February 28, 1974, subject to several conditions. A major consideration in approval of the permit was SCE's assurance the public would be only temporarily denied access to the beach.

Condition A of permit No. 183-73 required public access across the federal property to the two parts of San Onofre State Beach during specified times of the year while SONGS units 2 and 3 were under construction.[4] Condition D of the permit required SCE to guarantee the preservation of a specifically identified beach, bluff, and canyon area to the south of the site. Subparagraph 3 of condition D required that upon completion of the erosion control program ". . . applicants shall allow full and uninterrupted public access to the beach, bluff, and canyon area that is to remain in its present condition." Subparagraph 4 of condition D required SCE to execute and record an instrument to assure conformance with condition D of the permit.[5] SCE executed the guarantee agreement on April 3, 1974.[6]

In order to obtain construction and operating permits from the NRC, an applicant is required to demonstrate the nuclear power plant satisfies all federal safety requirements. Pursuant to NRC regulations, SCE was required to demonstrate that it had established at the SONGS site an ". . . area

---

[3]The 1972 act expired on December 31, 1976 (Pub. Resources Code, § 27650), and was replaced by the California Coastal Act of 1976. (Pub. Resources Code, §§ 30000-30900.)

[4]See appendix A.

[5]See appendix B.

[6]See appendix C.

surrounding the reactor, in which the reactor licensee has the authority to determine all activities including exclusion or removal of personnel and property from the area." (10 C.F.R. § 100.3(a).) The exclusion area must be large enough that an individual located at its perimeter will receive no more than specified doses of radiation in the event of an accident at the nuclear plant. (10 C.F.R. § 100.11(a)(1).)

On April 25, 1975, the Atomic Safety and Licensing Appeals Board ruled that SCE's original exclusion-area plan was unacceptable because SCE could not exercise the degree of control required by 10 Code of Federal Regulations, section 100. SCE reduced the exclusion area to include the federal beach on the SONGS site as well as the state-owned tidelands immediately in front of the site. Under SCE's revised plans submitted to the NRC it proposed two principal steps to obtain the requisite degree of control over the federal beach. First, SCE would seek amendment of the Navy's grant of easement to more clearly delineate SCE's power to exclude people and property from the exclusion area. Second, SCE would implement physical controls to insure SCE's ability to exclude the public from the federal beach in the event of radiation release. In particular, the 1975 plan called for the construction of an eight-foot perimeter fence topped with barbed wire along the north and south boundaries of the site extending to the federal property line at the mean high tide mark and along the walkway paralleling the seawall in front of the reactor units. The implementation of this portion of the plan would require 2.2 acres of dry sand beach seaward of the plant to be fenced to the mean high tide line and completely closed to all forms of public access. Other proposed physical controls consisted of warning signs, surveillance by television cameras, and periodic patrol by security personnel. SCE maintained none of these controls would be permitted to exclude the public from the tideland area.

SCE's 1975 plan proposed continued public use of the federal property for the purpose of crossing between the state beach areas to the north and south and to view the preserved areas at the southern end of the site. To facilitate these public uses and assist in speedy evacuation, SCE proposed construction of a wider walkway extending from the north state beach area to the bluff area and south state beach area.

The NRC approved SCE's revised exclusion area plan relying on SCE's commitment to install a walkway, fences, and signs to assure SCE's ability to exclude persons from the area immediately surrounding the nuclear reactors in the event of a radiation release. (*Southern California Edison et al.* (San Onofre Nuclear Generating Station Units 2 & 3) 5 NRC 1270, 1280-84, 1288-89 (May 20, 1977).)

In April 1978 the Commission informed SCE that the new exclusion area plan constituted a material deviation from the original coastal development permit and that implementation of the physical controls would violate the terms of permit No. 183-73. SCE initially disagreed with the Commission's analysis of the effect of its increased controls on the conditions set forth in the permit. SCE contended the changes were neither material nor inconsistent with the existing permit, since SCE continued to allow public access to the preserved areas. SCE filed for amendment of the permit in December 1981 when construction of unit 2 was essentially complete.

The Commission held public hearings in January and February 1982. On February 16, 1982, the Commission granted amendment No. 6-81-330-A and formally adopted findings in support of the decision on April 20, 1982. The amendment allowed SCE to implement the NRC's control requirements by constructing a fence above and parallel to the mean high tide line between the walkway and the beach. As part of the amendment, the Commission set forth additional conditions to mitigate the impact of reduced beach access at the SONGS site. SCE was required to (1) pay $3 million for construction of campsites at San Onofre State Beach and (2) convey to the State of California two oceanfront parcels located in Carlsbad.[7]

Carstens filed a petition for writ of mandate requesting the court to set aside the Commission's decision to amend the permit. The court denied the writ in July 1984 and this appeal ensued.

Carstens presents four issues on appeal. He argues the trial court erred in denying the petition for writ of mandate because: (1) the Commission lacked authority under Public Resources Code section 30609 to amend the permit; (2) the amendment violates the California Constitution and the California Coastal Act in failing to protect the right of free access to the tidelands; and (3) the Commission decision to limit the scope of review to the issue of beach access violates the coastal act. Carstens also claims certain findings of the Commission do not support its decision to amend the permit. Lastly, Carstens asserts he is entitled to fees and costs in the event the decision of the coast Commission is set aside. We affirm the judgment of the trial court for reasons we explain.

DISCUSSION

I

Public Resources Code section 30609 authorizes amendment of coastal development permits issued under the California Coastal Zone Conservation

---

[7]See appendix D.

Act of 1972 where recorded terms and conditions of the permit "are not dedications of land or interests in land for the benefit of the public or a public agency . . . ."[8] Carstens claims the Commission lacked authority to amend SCE's permit because the conditions to be amended involved the dedication of an interest in land for public use. The Commission concluded it had authority to amend the permit because there had been no dedication of land; the guarantee agreement merely promised to allow the public to enter. The trial court ruled the access rights afforded the public constituted a license and not the dedication of an interest in land. Because we conclude there was no dedication, we need not decide whether the guarantee agreement created an easement or license.

■ A dedication is a voluntary transfer of an interest in land and resembles both a grant and a gift. It is therefore governed by the fundamental principles which control such transactions. (*County of Inyo* v. *Given* (1920) 183 Cal. 415, 418 [191 P. 688].) Because dedication involves loss of private property for public use without compensation, there must be a clear and unequivocal intent by the owner to dedicate the property to public use. (*Cal. Water & Tel. Co.* v. *Public Util. Com.* (1959) 51 Cal.2d 478, 494 [334 P.2d 887]; 3 Miller & Starr, Current Law of Cal. Real Estate (rev. ed. 1977) § 20:2, p. 458.) The intention to dedicate land need not be expressly stated but can be inferred from the actions of the owner. (*Cal. Water & Tel. Co.* v. *Public Util. Com., supra,* at p. 495.) There must also be an acceptance by the public of the offer to dedicate. (*Union Transp. Co.* v. *Sacramento County* (1954) 42 Cal.2d 235, 240 [267 P.2d 10].) Acceptance may be express or implied. (*County of Inyo* v. *Given, supra,* 183 Cal. at p. 418.) Express acceptance occurs when formal acceptance is made by the proper authorities. (*Ibid.*) Acceptance is implied where the public has made use of the property for a period of time which demonstrates an intention to accept dedication (*ibid.*) or where actions by the responsible public officials indicates an assumption of control over the property. (*Union Transp. Co.* v. *Sacramento County, supra,* 42 Cal.2d at p. 244.) However, prescriptive rights may not be asserted against the federal government. (28 U.S.C.

---

[8]Section 30609 reads: "Where, prior to January 1, 1977, a permit was issued and expressly made subject to recorded terms and conditions that are not dedications of land or interests in land for the benefit of the public or a public agency pursuant to the California Coastal Zone Conservation Act of 1972 (commencing with Section 27000), the owner of real property which is the subject of such permit may apply for modification or elimination of the recordation of such terms and conditions pursuant to the provisions of this division. Such application shall be made in the same manner as a permit application. In no event, however, shall such a modification or elimination of recordation result in the imposition of terms or conditions which are more restrictive than those imposed at the time of the initial grant of the permit. Unless modified or deleted pursuant to this section, any condition imposed on a permit issued pursuant to the former California Coastal Zone Conservation Act of 1972 (commencing with Section 27000) shall remain in full force and effect."

§ 2409a(g); *Sweeten* v. *U.S. Dept. of Agr. Forest Service* (10th Cir. 1982) 684 F.2d 679, 682.)

 In this case there was no clear and unequivocal offer to dedicate an interest in land to the public. We conclude SCE merely intended to satisfy the conditions set by the Commission and those conditions did not require dedication of land for public use. We do not base our conclusion on the Commission and SCE's after-the-fact assertion that neither intended anything other than a license to cross federal beach property for specified purposes. Our position finds ample support in the record.

In determining SCE's intent with respect to granting public access to the beach property, we must consider its words and actions in the context of efforts to accommodate the layers of government concerned with construction and licensing of nuclear power plants. Each level of government— local, state and federal—has particular areas of concern and specific requirements for its permits and licenses. As this case well demonstrates, the requirements are sometimes in conflict. SCE was no stranger to the permit and licensing process, having successfully put SONGS unit 1 into operation. Of all the parties involved, SCE was in the best position to anticipate the requirements of each level of bureaucracy. SCE could not have intended to dedicate land for public use where such dedication would preclude later efforts to accommodate the requirements of another level of the permit and licensing process.[9]

SCE's power to alienate an interest in the SONGS site was limited by the fact it did not own the underlying property. The construction and operation of SONGS was authorized by a 60-year easement granted SCE by the federal government. The scope of the easement included regulation and removal of persons from the exclusion area in the event of a nuclear accident.[10]

The NRC later required SCE to obtain modification of the easement to more clearly delineate SCE's power to exclude people and property from the exclusion area.

---

[9]We note that the California Coastal Zone Conservation Act of 1972 placed no limitation on the amendment process comparable to that which appears in section 30609 of the 1976 act. Because we conclude there was no dedication, we need not address the due process issues which may be present.

[10]Paragraph 9 of the easement states in part: "That in the event of a nuclear incident or accident at the Nuclear Station, to protect the public health and safety, the Grantees may regulate the activities in and remove any and all persons from such portion of the exclusion area located outside of the Nuclear Station, as is established from time to time, by, or with the approval of, the United States Atomic Energy Commission, and as is located within the lands described in Exhibit B."

██ An easement is a nonpossessory interest in the land of another that gives its owner the right to use that property. (*Elliott* v. *McCombs* (1941) 17 Cal.2d 23, 30 [109 P.2d 329].) As such, an easement cannot be an estate in real property. (*Darr* v. *Lone Star Industries, Inc.* (1979) 94 Cal.App.3d 895, 901 [157 Cal.Rptr. 90].) An easement may not be imposed upon another easement because only an estate in land may serve as the servient tenement. (*City of Hayward* v. *Mohr* (1958) 160 Cal.App.2d 427, 432-433 [325 P.2d 209]; 3 Miller & Starr, Current Law of Cal. Real Estate, *supra,* § 18:4, p. 253.) ██ The parties included a general acknowledgement of the limitations on SCE's powers in paragraph 7 of the guarantee agreement. (See appen. C.)

Under the 1972 act the Coastal Zone Conservation Commission had the power to require dedication as a condition to permit approval.[11] Here it chose not to do so. The wording of permit No. 183-73 clearly requires execution of a "guarantee . . . to assure conformance with the intent of [Condition D] . . . which instrument shall be duly recorded." There are no words of offer or grant and no requirement that compliance with condition D be accepted by the Commission.

We compare the wording of the permit with the wording of condition H2 of the amendment. (See appen. D.) In 1982 Commission required SCE to record "an offer to grant in fee . . . two parcels of oceanfront property . . . ." The offer was to be accepted within a specified time frame. Prior to recordation SCE was required to "submit the documents conveying the *offer of dedication* to the executive director for his review and approval." (Italics supplied.)

It is reasonable to assume the Commission's use of a guarantee rather than dedication in the original permit was deliberate in light of the limitations placed on SCE's power to alienate the property as holder of a mere easement. In drafting condition H of the amendment the Commission faced no such limitation on SCE's power to convey the two parcels of beachfront property. SCE held that land in fee. Thus dedication was required as a condition of the permit amendment.

The parties' preoccupation with the fine distinctions between easements and licenses draws attention from the realities of the permit process. Given SCE's experience dealing with the conflicting demands of various levels of government bureaucracy and the Commission's recognition of the limitation

---

[11]Former Public Resources Code section 27403 (Coastal Zone Conservation Act of 1972) provides that "[a]ll permits shall be subject to reasonable terms and conditions in order to ensure: (a) Access to publicly owned or used beaches, recreation areas, and natural reserves is increased to the maximum extent possible by appropriate dedication . . . ."

on SCE's power to alienate an interest in government land, the Commission never asked for a dedication and SCE never offered it. The Commission had authority to consider SCE's application to amend permit No. 183-73.

## II

Carstens next argues that taken together the walkway, eight-foot barbed wire topped fence, signs, television surveillance, public address system, and security patrols discourage "any person of reasonable sensibilities from using any part of the beach other than the walk." He maintains the amendment limiting access to the tidelands[12] violates the public trust doctrine set forth in article X, section 4 of the California Constitution and the Coastal Act of 1976. We conclude the Commission properly exercised its duty under California law to consider the various uses of tidelands under the public trust doctrine in reaching its decision to grant the amendment. Of particular significance is the Commission's recognition of impairment of access to the tidelands and its requirement that SCE mitigate the loss through dedication of beachfront land and funds for the improvement of the nearby state campground.

## A

██ When California was admitted to the union in 1850, it acquired sovereign ownership of tidelands under the terms of a common law trust doctrine evolved from Roman and English law. (*City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 521 [162 Cal.Rptr. 327, 606 P.2d 362], cert. den. 449 U.S. 840 [66 L.Ed.2d 48, 101 S.Ct. 119]; see also Comment, *California's Tidelands Trust for Modifiable Public Purposes* (1973) 6 Loyola L.A. L.Rev. 485.) Public trust easements are traditionally defined to include navigation, commerce and fishing. (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 259 [98 Cal.Rptr. 790, 491 P.2d 374].) More recently the California Supreme Court broadened the range of public uses to include the right to fish, hunt, bathe, swim, to use for boating and general recreation, and to preserve "those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area." (*Id.*, at pp. 259-260.) In response to early abuses in the disposition of tidelands in San Francisco Bay, the Legislature in 1879 adopted article XV, sections 2 and 3 of the Constitution (now art. X, §§ 3 & 4.) (*City of Berkeley* v. *Superior Court, supra,* 26 Cal.3d at pp. 522-

---

[12]Tidelands are those lands which lie between the lines of mean high tide and mean low tide. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 478, fn. 13 [91 Cal.Rptr. 23, 476 P.2d 423].)

523.) Section 4 prohibits obstruction of the right of way to the tidelands when required for public purpose.[13]

Carstens implies the Commission must preserve recreational access to the tidelands without consideration of other competing public trust purposes. We are well aware of the ever-increasing pressures for development of our coastline and share Carstens' concern for protection of this priceless resource. ■ Nonetheless the public trust doctrine as codified in the California Constitution does not prevent the state from preferring one trust use over another. (*National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 439, fn. 21 [189 Cal.Rptr. 346, 658 P.2d 709].) In *Boone* v. *Kingsbury* (1928) 206 Cal. 148 [273 P. 797], the court ordered issuance of permits for oil and gas exploration on tidelands. The surveyor-general of the state had refused to grant the permits on grounds it would authorize the conduct of business on the tidal and submerged lands which would interfere with navigation and fisheries. The court held gasoline production furthered the legitimate trust purpose of commerce. (*Id.,* at p. 181.) The court in *Martin* v. *Smith* (1960) 184 Cal.App.2d 571 [7 Cal.Rptr. 725] authorized commercial development of a filled breakwater in Sausalito to include restaurants and cocktail lounges in addition to a yacht harbor. The court held the term "commercial purposes" in the lease from the State Lands Commission should be read broadly since the purpose of article XV, section 3 (now art. X, § 3) dealing with sale of tidelands "was not to blight commercial enterprise, but to foster it." (*Id.,* at p. 578.) Most recently in *Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408 [62 Cal.Rptr. 401, 432 P.2d 3] the state proposed construction of a freeway bridge which partially impaired navigation in the Stockton Deep Water Channel. Owners of shipyards located upstream sued for damages on a theory of inverse condemnation. The court concluded property littoral to navigable waterways was subject to a public trust easement which precluded an action for damages absent an actual taking of those lands. (*Id.,* at p. 420.) In so doing, the court affirmed the state's power to promote commerce over navigation.

■ We find nothing in article X, section 4 to preclude the Commission from considering commerce as well as recreational and environmental needs in carrying out the public trust doctrine.

---

[13]Article X, section 4 states: "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof."

B

The provisions of the California Coastal Act of 1976 demonstrate the Legislature's recognition of the need to balance competing interests in the effort to preserve the coastal zone. Maximization of public access is one of several goals articulated in the act. The Legislature also sought to "Assure orderly, balanced utilization and conservation of coastal zone resources *taking into account the social and economic needs of the people of the state.*" (Pub. Resources Code, § 30001.5, subd. (b), italics supplied.) Public Resources Code section 30210 makes specific reference to the public trust doctrine and emphasizes the need to consider public safety and private property interests. (See also Pub. Resources Code, §§ 30212, 30214.) The Legislature also recognized the realities of economic development in California, stating at section 30001.2: "The Legislature further finds and declares that, notwithstanding the fact electrical generating facilities, refineries, and coastal-dependent developments, including ports and commercial fishing facilities, offshore petroleum and gas development, and liquefied natural gas facilities, may have significant adverse effects on coastal resources or coastal access, it may be necessary to locate such developments in the coastal zone in order to ensure that inland as well as coastal resources are preserved and that orderly economic development proceeds within the state."

 Thus, the California Coastal Act of 1976 does not limit the Commission's inquiry to whether a proposed development limits access to the tidelands. The Legislature clearly requires consideration of public safety, rights of private property, and orderly economic development as well as environmental and public access concerns in granting and amending coastal development permits. The Legislature also provided guidance in resolving policy conflicts in section 30007.5, which states in part: "The Legislature further finds and recognizes that conflicts may occur between one or more policies of the division. The Legislature therefore declares that in carrying out the provisions of this division such conflicts be resolved in a manner which on balance is the most protective of significant coastal resources."

C

 The administrative record demonstrates the Commission considered the conflicting policy concerns and fashioned a compromise to address the practical realities. There are no facts to support Carstens' claim the Commission in balancing the policy issues placed protection of coastal resources at the bottom of the list of priorities.

At the time of SCE's application for amendment of permit No. 183-73, substantial work had been completed on SONGS units 2 and 3 and the NRC

was ready to grant an operating license for low power testing of unit 2 pending implementation of the revised exclusion area plan. SCE was willing to contribute $3 million toward mitigation of the loss of beach access as a condition of the Commission's granting the permit amendment.

Following the first public hearing on the SCE amendment in January 1982 the Commission reviewed a detailed staff report outlining mitigation proposals and problems with valuation of the mitigation package. At the February 16, 1982, public hearing the Commission voted to require dedication of two parcels of beachfront property in Carlsbad in addition to the $3 million payment already committed by SCE. The Commission's careful consideration of the public interest and accommodation of competing policy concerns is reflected in its findings: "Amendment of Permit 183-73 to incorporate the Exclusion Area Plan markedly diminishes public access and recreational opportunities over approximately 12 acres of sandy beach, bluffs, and canyons. Several particularly important considerations underlie the Commission's decision to allow the amendment. First, the NRC has determined that the Plan is necessary for the public health and safety, under federal regulations. (10 CFR 100.3(a).)

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . The permit and supporting record indicate that despite reservations concerning the impact on public access and the marine environment, the Commission in 1974 was influenced by the beneficial aspects of the project: the resulting diminution of air pollution and reduction in fossil fuel consumption as well as the increase in electricity supply . . . .

"In addition, the Commission recognized the reality that SONGS project, now virtually complete and ready to produce electricity, represents an expenditure in the vicinity of $3-billion. The cost will ultimately be borne by the ratepayers. The Commission finds that amendment of the permit with conditions which assure coastal access and recreation opportunities providing adequate mitigation for the lost benefits serves the public interest better than would litigation which seeks to block the project at this late stage. It is also consistent with energy-promoting policies of the Act." The court correctly determined there was no violation of article X, section 4 or the California Coastal Act in the Commission's decision to grant the amendment.

III

Carstens claims the Commission improperly limited the scope of review of SCE's proposed amendment to the access issue. He argues the

plain language of Public Resources Code section 30609 and title 14, California Administrative Code section 13166, subdivision (a)(4), require review of the entire development.

Carstens points out Public Resources Code section 30609 states that "Such application [for an amendment] shall be made in the same manner as a permit application." He argues a full project review is required since that is what is required in an original permit application. Because section 30609 applies only to requests to amend permits issued under the Coastal Zone Conservation Act of 1972, Carstens maintains the Legislature intended the broad scope of review for amendments to assure all coastal development conformed with the 1976 act. He also points to the regulations which implement amendment provisions. Title 14, California Administrative Code section 13166, subdivision (a)(4), provides the Commission in reviewing a proposed amendment "shall determine by a majority vote of the membership present whether the proposed development with the proposed amendment is consistent with the requirements of the California Coastal Act of 1976." Carstens argues the Commission cannot satisfy this regulation without reviewing the entire development project.

We do not read section 30603 and the related regulation so broadly. Applications are made "in the same manner" if they follow the same notice and procedural requirements. Nowhere is the Commission required to *treat* amendments in the same manner as new permit applications. Administrative Code, title 14, section 13166, subdivision (a)(4), applies to amendments to permits issued under both the old and new acts. Where a development is still "proposed" and substantial construction has not taken place, review of the entire development may be appropriate. However, where a permit was issued under the 1972 act and construction is virtually complete, no purpose is served in reviewing the completed project. The Legislature cannot have intended so wasteful an exercise.

The staff report issued before the January 1982 public hearing on SCE's proposed amendment recommended limiting the scope of review to public access. "The Applicants have a valid coastal development permit which they have rightfully exercised and relied upon in the construction of Units 2 and 3. Because the permit has been vested by the substantial work in constructing the plant, only the issues related to plant operation can be meaningfully addressed in this amendment. Changed circumstances have necessitated a change in the limited aspect of the permit affecting public access, and only that aspect of the permit is proposed for modification." Based on staff recommendations, the Commission found the development as amended and conditioned conformed with the Coastal Act of 1976. The

Commission in its findings gave two reasons for limiting the scope of review in response to Carstens' challenge on the issue before the first public hearing. First the Commission concluded the new access provision, including the mitigation conditions, were an adequate substitute for the original access provisions so that "the remainder of the permit and its underlying rationale need not be disturbed." In addition, the Commission noted section 13166, subdivision (a)(4) of the Administrative Code (tit. 14) dealt with "proposed development." Those regulations were inapplicable here because "the development is no longer *proposed,* but is essentially *complete.* In this situation, for the reasons already stated, the Commission finds it proper and equitable to limit the scope of review to the subject of the requested amendment."

The Commission acknowledges title 14, California Administrative Code section 13166, subdivision (a)(4), required it to determine whether a development with a proposed amendment was consistent with the 1976 act and complied with this requirement. In assessing whether the project conformed with the 1976 act the Commission was once again faced with the practical realities of this unusual chain of events. It would have been ludicrous for the Commission to pretend it was reviewing a new project. Thus it reasonably concluded it could only affect issues related to plant operation. To review the entire project would have been an idle act where the Commission was prohibited by Public Resources Code section 30609 from imposing more restrictive conditions than those required under the original permit.[14] Based on this record, we conclude the Commission properly limited the scope of its review of SCE's application for permit amendment and the court was correct in so ruling.

IV

Carstens challenges the trial court's ruling that the Commission's findings support its decision to grant the permit amendment. He claims the Commission was legally required under Public Resources Code section 30604 to find there would be no impairment of access to the tidelands. Thus the finding that public access might be indirectly impaired does not support granting the amendment.

Section 30604, subdivision (c), requires that every coastal development permit include "a specific finding that such development is in conformity with the public access and public recreation policies of [the coastal act]." The coastal act also recognizes that public safety, economic needs and private property rights are competing interests that must be balanced with efforts

---

[14]See footnote 8 at page 285, *ante.*

to preserve the coastal zone. (See Pub. Resources Code, §§ 30210, 30212, 30214.) As we explained, the public trust doctrine insures protection of the tidelands for commerce, navigation, and fisheries, as well as for recreational and environmental purposes. (See *Marks* v. *Whitney, supra,* 6 Cal.3d at pp. 259-260.) In this broader context section 30604 cannot be read to require a preliminary finding that a permit or amendment will not impair public access to the tidelands.

Here the Commission's concern about access to the tidelands was evident throughout the permit and amendment process. The Commission clearly stated the amendment did not authorize impairment of public access to the tidelands or submerged lands adjacent to SCE's easement either directly or indirectly.[15] Only after requiring substantial conditions to mitigate the loss of beach access did the Commission conclude SCE's development conformed with the 1976 act. Furthermore, the exclusion area plan was required by the NRC's regulations concerning public safety. Under Public Resources Code section 30212 the Commission may decline to condition a new development permit on public access where it is inconsistent with demands of public safety. (*Grupe* v. *California Coastal Com.* (1985) 166 Cal.App.3d 148, 183, fn. 24 [212 Cal.Rptr. 578].) We see no reason the exceptions set forth in section 30212 should not apply with equal force to permit amendments.

The Commission's decision not to demand beach access within the exclusion area was reasonable under the circumstances and the court was correct in concluding the Commission's findings supported its decision.[16]

## DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Lewis, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 21, 1986. Bird, C. J., was of the opinion that the petition should be granted.

---

[15]The Commission apparently concluded after viewing the diagrams of the exclusion area plan that access to the tidelands would only be "indirectly impaired" so long as the eight-foot barbed wire fence did not extend beyond the mean high tide line.

[16]Given our resolution of this case, we need not address Carstens' request for attorney's fees.

## APPENDIX A

Condition A of permit No. 183-73 reads:

"A. *Public Access Around Construction Site.*

"1. The applicants shall provide public access between the two parts of the San Onofre State Beach, around the construction site, from 8 a.m. to sunset on Saturdays, Sundays, and National Holidays in the months of June, July, August, and September, beginning in the year 1975 and continuing through the construction period.

"2. The access shall be provided by means of a walkway no less than 6 feet wide.

"3. Signs shall be posted by the applicants at both ends of the walkway to provide reasonable notice to the public of the existence of the walkway and of the days and hours it will be open.

"4. Public use of the walkway may be interrupted for a maximum of one hour per day, with each interruption to last no more than 15 minutes, to allow the movement of construction equipment or workmen."

## APPENDIX B

Condition D of permit No. 183-73 reads:

"D. *Use of Project Site*

"1. Prior to commencement of construction, the applicants shall guarantee the protection, in their natural condition, of the areas shown in Exhibit 1, designated as 'Bluff Area (unexcavated) (approx. 5 acres)' and also an area extending north from the 'Bluff Area (unexcavated) (approx. 5 acres)' for .10 mile and bounded by the mean high tide line and a line 100 feet east of the top edge of the bluff. The property immediately east of the areas to remain undisturbed may be graded and filled for use as a level site for construction equipment; such leveling and grading shall be to an elevation of approximately one hundred (100) feet in the area east of the 'Bluff Area (unexcavated) (approx. 5 acres)' and shall be to an elevation of not less than forty-five (45) feet in the area east of the above described one-tenth ($\frac{1}{10}$) mile area, except for grading necessary to provide an access road to the construction site for Units 2 and 3 (Exhibit 1A, revised 2/26/74).

"2. As part of the construction of Units 2 and 3, the applicants shall institute a program to prevent erosion and to stabilize the bluff-canyon area in its present condition.

"3. Upon completion of the erosion control and canyon stabilization program described in paragraph 2 above, the applicants shall allow full and uninterrupted public access to the beach, bluff, and canyon area that is to remain in its present condition.

"4. The guarantee required by this condition shall be for the duration of applicants' site easement (expiration date, May 1, 2023) and shall be satisfied by means of a duly executed instrument submitted to and approved, for form and content, by the Executive Director and the Attorney General to assure conformance with the intent of this condition, and which instrument shall be duly recorded. The intent of this condition is to assure that, through the Commission's planning program and other means, this area, which is the most scenic part of the project site, will be provided permanent protection.

"5. Compliance with the conditions in Section D, Use of Project Site, shall be monitored and enforced by the Commission or by its successor, and if there is no successor, then by the State Parks and Recreation Commission."

## APPENDIX C

SCE's guarantee agreement provides in relevant part:

### GUARANTEE AGREEMENT

"THIS GUARANTEE AGREEMENT is made and effective as of the 1st day of March, 1974,

by and between SOUTHERN CALIFORNIA EDISON COMPANY, a corporation, and SAN DIEGO GAS & ELECTRIC COMPANY, a corporation, (hereinafter collectively referred to as 'Owners'), and the CALIFORNIA COASTAL ZONE CONSERVATION COMMISSION, an agency of the State of California, (hereinafter referred to as 'Commission'), and is made with reference to the following facts:

"WHEREAS, Owners are grantees under an easement granted by the United States of America for the construction, operation, maintenance and use of a nuclear electric generating station, consisting of one or more generating units, and appurtenances thereto, in, under, over and upon the lands described in Exhibit A attached hereto and made a part hereof by this reference, for a term of sixty (60) years, said easement having been granted pursuant to Public Law 88-82, approved July 30, 1963, and said easement having been recorded in the Office of the County Recorder of San Diego County as File/Page No. 85887, on May 12, 1964; and

". . . . . . . . . . . . . . . . . . . . . . . .

"WHEREAS, Owners sought and obtained from the CALIFORNIA COASTAL ZONE CONSERVATION COMMISSION a permit for the construction of Units 2 and 3 and related facilities which permit (California Coastal Zone Conservation Commission Permit No. 183-73) was issued by the Commission on February 28, 1974, and was accepted by Owners on March 1, 1974; and

"WHEREAS, the Commission required, as a condition to said permit, *inter alia,* that Owners guarantee the protection, in their natural condition, of certain areas within the easement site, such areas being described in detail in said permit in Condition D thereof and depicted on Exhibit 1A (Revised 2/26/74) thereto; and

"WHEREAS, the said condition further required that the condition be satisfied by a duly executed recorded instrument; and

"WHEREAS, Owners and Commission desire by this instrument, which is to be recorded in the Office of the County Recorder of the County of San Diego, to satisfy the condition of said permit.

"Now, THEREFORE, it is agreed by and between the parties hereto as follows:

"1. *Guarantee.* Owners guarantee the protection, in their natural condition, of the areas shown in Exhibit 1A attached hereto and made a part hereof by this reference, designated as 'Bluff Area (unexcavated) (approx. 5 acres)' and also an area extending north from the 'Bluff Area (unexcavated) (approx. 5 acres)' for .10 mile and bounded by the mean high tide line and a line 100 feet east of the top edge of the bluff (hereinafter collectively referred to as 'Unexcavated Areas'). The property immediately east of the areas to remain undisturbed may be graded and filled for use as a level site for construction equipment; such leveling and grading shall be to an elevation of approximately one hundred (100) feet in the area east of the 'Bluff Area (unexcavated) (approx. 5 acres)' and shall be to an elevation of not less than forty-five (45) feet in the area east of the above described one-tenth (1/10) mile area, except for grading necessary to provide an access road to the construction site for Units 2 and 3.

"2. *Stabilization Program.* As part of their site preparation and construction activities regarding Units 2 and 3, Owners shall design and implement a program to prevent or retard erosion and to stabilize the Unexcavated Areas in their present or natural condition. The erosion control and canyon stabilization program shall consist of the elements and activities described in Exhibit B attached hereto and made a part hereof by this reference.

"3. *Access.* Upon completion of the erosion control and canyon stabilization program described in Paragraph 2 above, Owners shall, in a manner consistent with the provisions of Condition A of said permit, allow full and uninterrupted public access to the Unexcavated Areas,

"4. *Term.* This agreement shall terminate on May 1, 2023.

"5. *Consideration.* This Guarantee Agreement is made in consideration of the issuance by the Commission to the Owners of California Coastal Zone Conservation Commission Permit No. 183-73, and such other promises, covenants and agreements as are herein set forth.

". . . . . . . . . . . . . . . . . . . . . . . .

"7. *Limitation.* Commission acknowledges that the interest of Owners in the real property described in Exhibit A is an easement interest only, arising by virtue of the aforesaid grant

of easement from the United States of America, and that the right and power of Owners to encumber, restrict, or otherwise burden said real property or restrict or control the activities conducted thereon is limited to such right and power as is created by the easement grant and is subject to the limitations, if any, contained therein. The parties do not intend by this Guarantee Agreement to surcharge, overburden or otherwise jeopardize the interest of Owners acquired by virtue of said easement grant or to act in a manner inconsistent with the duties of Owners expressly provided for therein or necessarily implied by law."

## APPENDIX D

The findings of the California Coastal Commission read in relevant part:

Permit 183-73 is hereby amended by the following modifications to the existing condition A, condition D and condition G (new wording is underlined, deleted wording is shown in strikeouts):

"Condition A. PUBLIC ACCESS AT SITE

". . . . . . . . . . . . . . . . . . . . . . . .

"5. Beginning immediately prior to fuel loan at unit 2 or unit 3 and continuing as long as required by the Nuclear Regulatory Commission, public access at the site may be limited in the manner set forth in 'San Onofre Nuclear Generating Station unit Nos. 2 & 3, Preliminary Safety Analysis Report.' Section 1.8, et seq. and 'Final Safety Analysis Report', Section 2.1, et seq., as amended (hereinafter referred to collectively as the 'Exclusion Area Plan'), attached hereto as Exhibit A [staff report Exhibit 3] and incorporated herein. Implementation of the Exclusion Area Plan shall not eliminate or change the requirements of parts 1 through 4 of this Condition A, which are applicable throughout construction of the project.

"6. Upon completion of construction and throughout the term of the Exclusion Area Plan, public passage between sections of San Onofre State Beach north and south of the plant site shall be provided for through the Exclusion Area by means of a walkway no less than 15 feet wide. This walkway shall be open to the public at all times except when closure is necessary for reasons of public safety or plant security.

"Condition D. USE OF PROJECT SITE

". . . . . . . . . . . . . . . . . . . . . . .

"3. Upon completion of the erosion control and canyon stabilization program described in paragraph 2 above, the Applicants shall allow full and uninterrupted public access to the beach, bluff, and canyon area that is to remain in its present condition; provided, however, that such access may be limited in the manner set forth in the Exclusion Area Plan, as provided in Part 5 and Part 6 of Condition A of this permit.

"c. New Conditions

"The permit as amended is subject to the following additional condition, which shall be Condition H:

"Condition H. MITIGATION OF LOST ACCESS

"1. Within 30 days of the date of the Applicants' written acceptance of the amended permit, the Applicants shall deposit $3 million into an escrow account or reserve account established by the Applicants (if it is determined by the parties that the reserve procedure would be significantly less expensive and would ensure implementation of this condition), pursuant to an escrow agreement and instructions in form and content approved by the Executive Director. The escrow agreement and instructions shall provide that funds in the escrow or reserve account shall be used in mitigation of the lost and diminished public access opportunities at the project site in accordance with the following terms.

"(i) Beginning 60 days after the time the amended permit becomes final, during the next following 24 months, funds from the escrow or reserve account shall be payable only to the California Department of Parks and Recreation ('Parks Department') upon demand of the Parks Department and with the approval of the Executive Director for the purpose of improving Parcel 1 of San Onofre State Beach, as shown on the map attached hereto as Exhibit 4. The funds shall be applied in a manner which will result in creation and opening for public use

of a public recreational facility having approximately 200 improved campsites and linked to the beach by a hiking trail.

"(ii) At any time after the start of the twenty-seventh month after the amended permit becomes final, funds from the escrow or reserve account may be disbursed only as directed by the Commission after public hearing and only for the purpose of securing a public coastal access or recreational benefit which will serve the population affected by the loss of access at the project site and which will adequately mitigate for the loss of access at San Onofre.

". . . . . . . . . . . . . . . . . . . . . . .

"2. Within 60 days of the Applicants' written acceptance of the amended permit, the Applicants shall cause to be recorded an offer to grant in fee to the State of California the two parcels of oceanfront property at Carlsbad, hereinafter referred to as Parcels A and B, and more particularly described in Exhibit 6, attached hereto and incorporated herein. The offer shall not be accepted at any time before 60 days from the date the amended permit becomes final nor during the pendency of any appeal or other legal challenge to the validity of this amendment. In the event of a final judicial determination that the amended permit is invalid with respect to the substantive provisions of this amendment, title to Parcels A and B shall revert to San Diego Gas and Electric Company. The offer to grant in fee shall run with the land, binding successors and assigns, shall be recorded free of all prior liens, and shall be insured by title insurance acceptable to the executive director. Prior to recordation, the Applicants shall submit the documents conveying the offer of dedication to the executive director for his review and approval. The approved offer shall be recorded in accordance with the terms of this condition and evidence thereof submitted to the executive director. The offer to grant in fee shall be irrevocable for three years from the date of recordation or one year from the date any appeal or legal challenge is terminated, whichever is later, and in the event the offer is not accepted within that time, the Applicants shall immediately cause Parcels A and B to be conveyed to the State of California, subject to all terms and requirements heretofore set forth in relation to the offer to grant."