[No. A129896. First Dist., Div. One. Dec. 30, 2011.]

CITIZENS FOR EAST SHORE PARKS et al., Plaintiffs and Appellants, v. STATE LANDS COMMISSION, Defendant and Respondent; CHEVRON U.S.A. INC. et al., Real Parties in Interest and Respondents.

COUNSEL

Law Offices of Stephan C. Volker, Stephan C. Volker, Stephanie L. Abrahams, Daniel Garrett-Steinman, Jamey M.B. Volker and Joshua A.H. Harris for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, John A. Saurenman, Assistant Attorney General, Christiana Tiedemann and Joel S. Jacobs, Deputy Attorneys General, for Defendant and Respondent.

Pillsbury Winthrop Shaw Pittman, Ronald E. Van Buskirk, Kevin M. Fong and Todd W. Smith for Real Parties in Interest and Respondents.

OPINION

**BANKE, J.**—Defendant and respondent State Lands Commission (Lands Commission) approved a 30-year lease allowing real party in interest and respondent Chevron U.S.A. Inc. (Chevron) to continue operating a marine

terminal in San Francisco Bay waters, near the company's refinery in Richmond, California. Plaintiffs and appellants Citizens for East Shore Parks and Daniel P. Doellstedt contend that in approving the lease, the Lands Commission failed to comply with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and also violated the public trust doctrine. The trial court denied their petition for writ of mandate and complaint for declaratory relief. We affirm.

## I. BACKGROUND

The Long Wharf marine terminal and nearby Richmond refinery have been in existence since 1902. Standard Oil, Chevron's predecessor, bought the refinery and began operating it and the terminal in 1905.

The marine terminal is a T-shaped, concrete docking structure approximately 3,440 feet long. Ships can dock at four deep-water outer berths and several inner berths. Ships off-load crude oil at the terminal for processing at the refinery and take on refined products which they transport to national and international markets. The marine terminal has been modified over the years. In 1946, the original wooden structure gave way to the present concrete one. Alterations in 1974 allowed for larger vessels. Since then, Chevron has added new platforms, breasting dolphins, and a vapor control system. In 2000 and 2004, the company completed a major seismic upgrade and electrical system revamp.

While Chevron's refinery sits on private land beyond tidal reach, the marine terminal sits in the San Francisco Bay on submerged land owned by the state and subject to a public trust servitude and the control of the Lands Commission. The refinery and terminal are linked by a pipeline system that transfers oil and petroleum products between the two facilities. Leaving the terminal, the pipelines first cross a 4,200-foot causeway that largely stands atop submerged state land. The final 750 feet of the causeway, however, cross private land, which is submerged or partially submerged and therefore is also subject to a public trust servitude.[1] Beyond the causeway, the pipelines cross the "upland" area, land which is above tidal reach and not subject to such servitude.

In August 1947, the Lands Commission granted Standard Oil a 50-year lease for the marine terminal. Chevron assumed the lease in 1976, and the

---

[1] These submerged and partially submerged lands were previously owned by the state and sold to Chevron's predecessor in interest during the 1870's.

lease expired in 1997. Since then, Chevron has operated the terminal on a holdover basis, until the Lands Commission approved the 30-year renewal on January 29, 2009.[2]

Before the Lands Commission approved the lease renewal, it considered what actions it needed to take to comply with CEQA. The 1902 terminal predates CEQA by nearly 70 years. Thus, no CEQA study examined its construction or ensuing operation. The Lands Commission concluded future oil spills constituted a potentially significant environmental impact, requiring analysis in an environmental impact report (EIR).[3] The commission accordingly commissioned a draft EIR, solicited and responded to public comments, and issued a final EIR. Although the reports focus on the impact of potential oil spills, they also discuss other impacts, such as those to water quality and recreation. The EIR process took nearly nine years from the commission's notice it would prepare such a report, dated November 1998, to completion of the final EIR, dated March 2007.

In 1999, at the beginning of the review process, the Lands Commission determined the EIR should assess environmental impacts of the lease renewal against a baseline that assumed no terminal operations but the terminal structure remaining physically intact. Over the years, the Lands Commission changed its view as to the appropriate baseline. Accordingly, the draft and final EIR's defined the lease renewal project as allowing Chevron to "continue its existing Long Wharf operations" and used the existing, actual condition of the marine terminal, which included off-loading and on-loading operations, as the baseline by which to assess potential environmental impacts. Using this baseline, the EIR's concluded the lease renewal could result in significant environmental impacts due to potential oil spills.

The Lands Commission held public hearings on December 3, 2008, and January 29, 2009, at which it discussed and ultimately approved the final EIR. Plaintiffs appeared at the hearings and challenged the sufficiency of the EIR, claiming it omitted consideration of other significant impacts of the terminal's operation, especially in conjunction with the refinery, causeway, and pipelines. In approving the final EIR on January 29, 2009, the Lands

---

[2] We use the term "renewal" generically, referencing continued leasing of the property for the same uses.

[3] At the outset of the review process, the Lands Commission concluded the lease renewal did not qualify for the exemption from CEQA for projects involving minor alterations to existing facilities. At the final hearing on the renewal, commission staff acknowledged the exemption arguably applied. However, neither the commission nor Chevron pursued this point during the administrative proceedings. Nor did they do so in the trial court, although the trial court inquired about it. Likewise, on appeal, neither the Lands Commission nor Chevron has urged the exemption as an alternative ground to affirm the judgment.

Commission adopted a statement of overriding consideration that the lease should be renewed despite the fact oil spill risks could not be wholly mitigated.

During the review process there was also discussion about how lease renewal would affect recreational activities on not only the submerged and tidal lands over which the terminal and the causeway sit, but also on the "upland" area where plaintiffs want a portion of the Bay Trail (a hiking and biking trail that will encircle San Francisco Bay) constructed. Chevron met with proponents of the trail and officials of the City of Richmond and entered into a community benefits agreement with the city. This agreement, dated July 31, 2008, obligated Chevron to pay money and provide other consideration to the city if it issues permits for certain projects at the refinery. Chevron's commitment included specific resources for the Bay Trail, including an easement through its "upland" property and $2 million for any security measures necessary to keep trail users out of sensitive refinery areas.

Although prepared to vote on the lease renewal at the December 3, 2008, hearing, the Lands Commission postponed the vote until January 29, 2009, to provide Chevron and interested government agencies a further opportunity to discuss additional resources for the Bay Trail and make progress on several other issues of public concern. By the January 29 meeting, Chevron agreed to provide a second mile-long easement on its "upland" property for the trail, and also agreed to a plan to reduce nighttime glare from terminal lighting and to report on ship air emissions, which may be subject to future regulation.[4] Plaintiffs wanted Chevron to provide an additional $5 million to actually build the trail. The Lands Commission declined to impose such a condition or to delay the review process further, and approved the final EIR and the lease renewal.

On March 5, 2009, plaintiffs filed a combined petition for writ of mandate (under Code Civ. Proc., §§ 1085 and 1094.5 and Pub. Resources Code, §§ 21168 and 21168.5) and complaint for declaratory relief. They filed an amended petition and complaint on March 27, alleging two causes of action against the Lands Commission: one for violation of CEQA and one for violation of the public trust doctrine. Plaintiffs sought a writ directing the Lands Commission to decertify the EIR and vacate its approval of the lease renewal, and a declaration the commission had violated CEQA and the public trust doctrine. The trial court denied plaintiffs' writ petition and dismissed their complaint for associated declaratory relief on July 19, 2010, and entered judgment in favor of the Lands Commission on September 8, 2010.

---

[4] Chevron's agreements concerning the Bay Trail, including those made to the City of Richmond in the community benefits agreement of 2008, were reduced to a letter agreement with the Lands Commission. Although the community benefits agreement is no longer in force, the letter agreement persists.

## II. Discussion

### A. CEQA

#### 1. Standard of Review

On appeal from a writ of administrative mandate in a CEQA case, this court, just as the trial court, reviews the administrative record for "a prejudicial abuse of discretion." (Pub. Resources Code, § 21168.5;[5] see *Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council* (2010) 190 Cal.App.4th 1351, 1371 [119 Cal.Rptr.3d 481].) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; see *Sunnyvale, supra*, 190 Cal.App.4th at p. 1371.) "Judicial review of these two types of error differs significantly . . . ." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).) While we determine de novo whether the agency employed the correct procedures or properly interpreted CEQA's requirements, "we accord greater deference to the agency's substantive factual conclusions." (*Vineyard*, at p. 435; see *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1277 [119 Cal.Rptr.2d 402] (*Fat*).) "In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " (*Vineyard, supra*, at p. 435.)

#### 2. The Baseline

■ CEQA "requires a public agency to prepare an [EIR] only on projects that may have significant environmental effects." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315 [106 Cal.Rptr.3d 502, 226 P.3d 985] (*Communities*).) "To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis." (*Ibid.*) Thus, an inappropriate baseline may skew the environmental analysis flowing from it, resulting in an EIR that fails to comply with CEQA. (See *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 87 [99 Cal.Rptr.2d 378].)

As we have discussed, the Lands Commission initially indicated the appropriate baseline should exclude current operations at the marine terminal

---

[5] All further statutory references are to the Public Resources Code unless otherwise noted.

and consider only its physical structure. However, ultimately, the Lands Commission concluded the baseline should reflect the current operative condition of the terminal. Plaintiffs contend the Lands Commission had it right initially, and the baseline should have excluded any operational use of the terminal. They assert the Lands Commission's chosen baseline was contrary to law and, alternatively, unsupported by the evidence. The Lands Commission and Chevron maintain the California Supreme Court has made it clear the baseline for a CEQA analysis must reflect current conditions at a project site, and the baseline selected by the commission was both legally proper and supported by substantial evidence. We agree with the Lands Commission and Chevron.

### a. *The Baseline Is Not Contrary to Law*

The Supreme Court addressed the selection of CEQA baselines at length in *Communities, supra*, 48 Cal.4th 310. In that case, ConocoPhillips sought permits to modify or replace existing refinery equipment in order to produce a new low-sulfur diesel fuel. (*Id.* at p. 317.) Although the modified or new equipment would release more NOx (nitrogen oxide) gas than was currently being released at the site, the heightened emission level would still be within that allowed by existing permits. (*Id.* at p. 318.) The air quality district therefore treated the permitted emission level as part of the baseline, even though the actual emissions at the site had not reached that level. (*Ibid.*) Measured against this baseline, the district concluded the low-sulfur fuel project would not have significant environmental impacts and did not prepare an EIR. (*Ibid.*) The Court of Appeal reversed. The Supreme Court affirmed the appellate court, holding the baseline did not reflect "a realistic description of the existing conditions without the Diesel Project." (*Id.* at p. 322.)

■ "By comparing the proposed project to what *could* happen, rather than to what was actually happening, the District set the baseline not according to 'established levels of a particular use,' but by 'merely hypothetical conditions allowable' under the permits." (*Communities, supra*, 48 Cal.4th at p. 322, quoting *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 658 [57 Cal.Rptr.3d 663] (*San Joaquin Raptor*).) However, to afford meaningful environmental review of a proposed project's impact, a CEQA baseline must reflect "the 'existing physical conditions in the affected area' [citation], that is the ' "real conditions on the ground" ' [citations], rather than the level of development or activity that *could* or *should* have been present according to a plan or regulation." (*Communities*, at pp. 320–321.)

The Supreme Court observed the "CEQA Guidelines" (Cal. Code Regs., tit. 14, § 15000 et seq.) provide: " 'An EIR must include a description of the

physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. *This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.' "* (*Communities, supra,* 48 Cal.4th at p. 320, quoting CEQA Guidelines, § 15125, subd. (a).) Accordingly, the "normal" rule is that the baseline must reflect the "physical conditions existing at the time [the] environmental analysis" begins. (*Communities,* at pp. 320, 323; see also *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1167–1168 [77 Cal.Rptr.3d 578, 184 P.3d 709] (*In re Bay-Delta*) [preexisting environmental problems in the Bay Delta were part of the baseline conditions against which the potential impacts of the proposed project were to be measured]; *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 693 [58 Cal.Rptr.3d 102] [citing the "normal" rule and holding potential impacts of proposed development had to be measured against current undeveloped condition of the property, not development permissible under existing zoning].)

The court further observed a "long line of Court of Appeal decisions holds, in similar terms [to the Guidelines], that the impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis, rather than to allowable conditions defined by a plan or regulatory framework." (*Communities, supra,* 48 Cal.4th at p. 321.) Moreover, these cases reached this result even when the actual conditions were in violation of current regulatory provisions. (*Ibid.* & fn. 7.)

For example, in *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428 [91 Cal.Rptr.2d 322] (*Riverwatch*), the appellate court approved the county's chosen baseline, which included illegal development that had occurred at a mining operation seeking a use permit. The respondents could not, said the court, essentially turn back the clock and insist upon a baseline that excluded existing conditions. (*Id.* at pp. 1452–1453.) How present conditions come to exist may interest enforcement agencies, but that is irrelevant to CEQA baseline determinations—even if it means preexisting development will escape environmental review under CEQA. (*Riverwatch,* at pp. 1452–1453.) In *Fat, supra,* 97 Cal.App.4th 1270, the appellate court upheld the county's choice of a baseline reflecting present-day conditions to evaluate the impact of a proposed airport expansion. Even though "the Airport developed over a period of nearly 30 years without County authorization, there was evidence of environmental damage during that period, and the Airport had been the subject of at least two zoning enforcement actions . . . ," the county acted within its discretion using current airport operations as the baseline for CEQA review. (*Fat,* at pp. 1280–1281.) Similarly, in *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th

357 [54 Cal.Rptr.3d 485], the Court of Appeal upheld a project description for CEQA purposes that took into account an existing playground built contrary to code. "While any alleged code violations in the construction of the playground may have been relevant to the City's consideration of the variance requested, it was not a CEQA consideration." (*Eureka*, at p. 371, italics omitted; see also *Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238, 242–243 [82 Cal.Rptr.2d 436] [EIR prepared in conjunction for application to expand mining operation "properly discussed the existing physical condition of the affected area as including the long-operating mine"]; *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1312–1316 & fn. 3 [31 Cal.Rptr.2d 914] (*Bloom*) [" 'existing facility' " for categorical exemption purposes means a facility "as it exists at the time of the agency's determination, rather than . . . at the time CEQA was enacted"; this is consistent "with cases that have required potential impacts to be examined in light of the environment as it exists when a project is approved"].)

Accordingly, in *Communities*, the Supreme Court affirmed the Court of Appeal's directive that writ relief be granted and the matter be sent back to the air quality district to identify an appropriate baseline and reassess the environmental impacts of the proposed low-sulfur fuel project. (*Communities, supra*, 48 Cal.4th at pp. 327–329.)

■ As *Communities* requires, the baseline used by the Lands Commission here reflected "what was actually happening" at the site of the proposed project (*Communities, supra*, 48 Cal.4th at p. 322)—that is, an operating marine terminal. (See also *In re Bay-Delta, supra*, 43 Cal.4th at pp. 1167–1168; *Fat, supra*, 97 Cal.App.4th at pp. 1277–1278, 1280; *Riverwatch, supra*, 76 Cal.App.4th at p. 1453.) Indeed, we note that in *Riverwatch* and *Fat*, the appellate courts held even unlawful prior development and activity was properly included within the CEQA baselines for evaluation of proposed projects. Here, in contrast, the " ' "real . . . on the ground" ' " terminal operations (*Communities, supra*, 48 Cal.4th at p. 321) included in the baseline were entirely lawful.

Despite the foregoing authorities, plaintiffs assert the baseline for a *renewal* project must *exclude* current conditions because the approving agency can eliminate them by refusing the renewal. Thus, plaintiffs maintain the baseline here should exclude, at a minimum, use of the marine terminal and, possibly, the physical structure, itself.[6] In other words, plaintiffs claim the baseline here should reflect conditions that have not existed at the locale for more than

---

[6] Plaintiffs' distinction between "use" of the marine terminal and its physical structure, seems to us illusory since the terminal was built and exists for the specific use to which it is being put; use and structure, in other words, being hand in glove.

a century.[7] This is so, say plaintiffs, because if the baseline does not exclude current conditions, there will never be full environmental review of the marine terminal, since it predates CEQA.

However, neither the statute, nor any CEQA case, supports plaintiffs' revisionist approach to the baseline. To the contrary, the CEQA Guidelines require a "description of the physical environmental conditions in the vicinity of the project, *as they exist at the time the notice of preparation [of an EIR] is published*" and specify "[t]his environmental setting will normally constitute the baseline . . . ." (CEQA Guidelines, § 15125, subd. (a), italics added.) The cases further make clear the baseline must include existing conditions, even when those conditions have never been reviewed and are unlawful. (See *Fat, supra,* 97 Cal.App.4th at pp. 1280–1281; *Riverwatch, supra,* 76 Cal.App.4th at pp. 1452–1453; see also *Communities, supra,* 48 Cal.4th at p. 321 & fn. 7.) That *Fat* and *Riverwatch* involved applications to expand and not merely renew operations, is immaterial. In both, baselines reflecting current conditions, including unauthorized and even environmentally harmful conditions, meant those conditions would never receive environmental review.

To state the converse of what the court observed in *Bloom*, the rule that the baseline should normally reflect "the environment as it exists *when a project is approved*," is consistent with the categorical exemption in CEQA for "existing facilities," meaning "a facility as it exists *at the time of the agency's determination*," not at the time (now several decades ago) when CEQA was enacted. (*Bloom, supra,* 26 Cal.App.4th at p. 1315 & fn. 3, italics added.) "We presume that thousands of permits are renewed each year for the ongoing operation of regulated facilities, and we discern no legislative or regulatory directive to make each such renewal an occasion to examine past CEQA compliance . . . ." (*Id.* at p. 1315.) Indeed, such a result would contravene the regulatory language and prospective character of the statute and, when applicable, also contravene limitations periods. (See *ibid.*)

Ultimately, plaintiffs rely principally on *League to Save Lake Tahoe v. Tahoe Regional Planning Agency* (E.D.Cal. 2010) 739 F.Supp.2d 1260 (*Tahoe I*). In that case, the Tahoe Regional Planning Agency sought to increase the number of authorized mooring buoys on Lake Tahoe. There were already numerous unauthorized buoys on the lake, and as to them, the agency either had to issue permits to allow their continued use, or deny permits and require their removal. (*Id.* at p. 1272.) The agency included all existing buoys, including those that were not authorized, in its environmental assessment baseline. (*Id.*

---

[7] Chevron's predecessor, Standard Oil, began using the terminal in 1905. Plaintiffs point out the 1947 lease allowed the state to request removal and restoration of the premises to their prelease condition if it conferred with the lessee at least six months before lease termination. However, the state never made any such request.

at p. 1273.) The federal district court ruled this was an abuse of discretion—the agency could not treat the existing but unauthorized buoys "as a fait accompli incorporated into an environmental baseline." (*Id.* at p. 1276.)

However, as the federal district court, itself, explained in denying a motion for reconsideration based on the California Supreme Court's then newly issued decision in *Communities*, it was concerned with the environmental provisions of the Tahoe Regional Planning Compact, an agreement between California and Nevada, and not with CEQA. (*League to Save Lake Tahoe v. Tahoe Regional Planning Agency* (E.D.Cal. 2010) 739 F.Supp.2d 1260, 1293, 1294–1295 (*Tahoe II*).) The compact's environmental provisions "go further than those of CEQA." (*Ibid.*) Accordingly, *Communities* was not on point, said the district court, and did not counsel a different baseline analysis under the planning compact. (*Tahoe II*, at pp. 1294–1295; see also *Tahoe I*, at p. 1275 [stating *Fat, supra*, 97 Cal.App.4th 1270, was not relevant because it was based on CEQA regulations].) The instant case, in contrast, is a CEQA case, and *Communities* is on point and controlling.

### b. *The Baseline Is Supported by Substantial Evidence*

██ In *Communities*, the Supreme Court did not attempt to spell out the particulars of the baseline the air quality district was required to adopt on remand, observing the district and ConocoPhillips had emphasized refinery operations are highly complex and current NOx emissions varied greatly depending on a variety of circumstances. (*Communities, supra*, 48 Cal.4th at p. 327.) As the court explained: "Neither CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence." (*Id.* at p. 328.) Accordingly, the court tasked the district with identifying a baseline that would allow comparison of "what was actually happening" without the proposed diesel fuel project and the "conditions expected to be produced by the project," thereby permitting an informed environmental assessment of the project. (*Id.* at pp. 322, 328; see also *San Joaquin Raptor, supra*, 149 Cal.App.4th at p. 659 ["established usage of the property may be considered to be part of the environmental setting . . . ," and when such usage is adequately shown in the record, agency satisfactorily acts on substantial evidence].)

Plaintiffs do not dispute that the baseline ultimately utilized by the Lands Commission reflected the then current conditions at the Long Wharf terminal. Indeed, the record shows the Lands Commission selected the baseline looking solely at, and accurately describing, the "physical environmental conditions in

the vicinity of the project, as they exist[ed] at the time the notice of preparation [was] published." (CEQA Guidelines, § 15125, subd. (a).)

Rather, pointing to the Lands Commission's initial statement made in 1999 that the baseline should exclude operational use of the terminal and reflect only its structural presence, plaintiffs claim there is no support in the record for the commission's decision to modify the baseline to reflect the actual conditions at the terminal. Plaintiffs claim the fact the Lands Commission initially selected a baseline that excluded use of the terminal established that a "no-lease" baseline was "more appropriate."

To begin with, plaintiffs cite no authority supporting the implied premise of their argument—that the Lands Commission could not revisit the baseline during the environmental review process and modify it as the commission deemed appropriate or necessary.[8] Moreover, such a suggestion is unsound. Administrative agencies not only can, but should, make appropriate adjustments, including to the baseline, as the environmental review process unfolds. No purpose would be served, for example, if an agency was required to remain wedded to an erroneous course and could only make a correction on remand after reversal on appeal.

The record also reveals a sound basis for the Lands Commission's adjustment of the baseline. Chevron presented the commission with information about other baseline determinations being made for proposed San Francisco Bay Area projects, and urged it to take the same approach so there would be uniformity in the environmental review process. In addition, the case law in the area was being developed through decisions such as *Fat, supra,* 97 Cal.App.4th at pages 1277–1281, which endorsed and followed *Riverwatch, supra,* 76 Cal.App.4th 1428. Thus, as the Lands Commission explained, its view of the appropriate baseline evolved over time, ultimately leading to modification of the baseline in the 2003–2004 timeframe, some four years before it completed the environmental review process.

In sum, the Lands Commission did not abuse its discretion in defining the baseline used to assess environmental impacts of the proposed marine terminal lease renewal. The baseline was not contrary to the law, and it was based on substantial evidence.

---

[8] *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 13 [78 Cal.Rptr.2d 1, 960 P.2d 1031], which plaintiffs cite, is not on point. It is not a CEQA case and simply stands for the well-established principle of statutory interpretation that an agency's " 'vacillating position . . . is entitled to no deference.' " (*Yamaha,* at p. 13.)

3. *Other Alleged Deficiencies in the Final EIR*

 a. *Buried Pipeline Alternative*

█ A compliant EIR considers a "range of reasonable alternatives" to a proposed project to "foster informed decisionmaking and public participation." (CEQA Guidelines, § 15126.6, subd. (a).) Plaintiffs assert the final EIR failed to consider a particular alternative—the removal of the causeway and burying the pipelines running between the terminal and the refinery. Plaintiffs claim this alternative would have reduced the environmental impact of the proposed marine terminal project by opening up new recreational uses on the bay underneath the causeway and on the beach near the currently exposed pipelines.

"An EIR need not consider every conceivable alternative to a project." (CEQA Guidelines, § 15126.6, subd. (a).) Moreover, "alternatives shall be limited to ones that would avoid or substantially lessen any of the significant effects *of the project.*" (CEQA Guidelines, § 15126.6, subd. (f), italics added; see Pub. Resources Code, § 21083, subd. (b)(2) [EIR did not need to consider impacts that are not "effects of [the] individual project"]; see also *In re Bay-Delta, supra,* 43 Cal.4th at pp. 1167–1168 [appellate court should not have considered alternative concerning delta environmental problems that would continue to exist even without the proposed project; such problems were part of the baseline, and the alternative did not address adverse environmental impacts of the proposed project]; *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 928 [99 Cal.Rptr.3d 621].) In *Tracy First,* for example, the EIR only identified air quality and traffic as potential significant impacts and did not consider the alternative of a reduced-size project. Nor did it need to, said the Court of Appeal, because a reduced-size alternative would not have addressed air quality and traffic, but only other impacts such as store closures and energy consumption, which were not identified as significant environmental impacts of the project. (*Tracy First,* at pp. 928–929.)

The same analysis applies here. The final EIR identified potential significant impacts due to oil spills, but not due to impediment of recreation. Accordingly, the EIR did not need to address the causeway removal and buried pipeline alternative urged by plaintiffs, since it was directed at an asserted impact not identified in the EIR. Furthermore, given that the baseline properly reflected *existing* conditions, which included the causeway and pipelines supported thereby, the final EIR correctly concluded the asserted impact on recreational uses was not a potential significant impact of the lease renewal project.

b. *Project Description*

■ A project "refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies." (CEQA Guidelines, § 15378, subd. (c).) Plaintiffs assert the final EIR did not adequately describe the "project" before the Lands Commission and, specifically, claim the project description should have included Chevron's entire refinery operation, as well as continued use of the Long Wharf marine terminal.

However, the only approval at issue is the Lands Commission's renewal of the lease for continued use of the marine terminal on submerged land owned by the state and controlled by the commission. The refinery, in contrast, sits on private property presently owned by Chevron and requires no approvals by the commission for continued operations.

The cases cited by plaintiffs in support of their broader project description argument are inapposite. Both *Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1223 [66 Cal.Rptr.3d 645] and *San Joaquin Raptor, supra,* 149 Cal.App.4th at page 654, hold an approving agency may not "chop up" a proposed project into small segments and review each segment in a separate CEQA analysis to misleadingly downplay the impact of the proposed project as a whole. In this case, however, the refinery needs no approval from the Lands Commission to continue its operations, and the commission did not "chop up" the project before it—renewal of the marine terminal lease—in order to minimize environmental impacts associated with *that* project.

c. *Cumulative Impacts*

■ Even though a project's impact may be "individually limited," such impact may be "cumulatively considerable." (§ 21083, subd. (b)(2); CEQA Guidelines, § 15065, subd. (a)(3).) " '[C]umulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (§ 21083, subd. (b)(2); see CEQA Guidelines, § 15065, subd. (a)(3).) "An EIR shall discuss cumulative impacts of a project when the project's incremental effect is cumulatively considerable . . . ." (CEQA Guidelines, § 15130, subd. (a).) Plaintiffs assert the final EIR failed to address environmental impacts of the marine terminal cumulatively with impacts of the refinery. They specifically complain the EIR

failed to consider the cumulative impacts of water discharges from the terminal, combined with discharges from the refinery.[9]

However, the final EIR *did* consider the cumulative impact of water discharges from the terminal and the refinery into the bay. Section 4.2.1 of the draft EIR sets forth the state of the bay's water quality, and page 4.2-5 of that section discusses discharges from the refinery. Pages 4.2-55 to 4.2-58 of the draft EIR address cumulative impacts of the terminal's discharge and other discharges into the bay, including those from the refinery. Moreover, consideration of these water discharges was not required here. As we have discussed, the baseline for assessing the environmental impacts of the lease renewal project properly reflected the marine terminal's then current operative condition, which included the water discharges. Accordingly, the EIR did not need to consider the cumulative impact of these discharges because they were not "effects of [the] individual project" under consideration. (See § 21083, subd. (b)(2).)

### d. *San Francisco Bay Area Water Trail Act*

The San Francisco Bay Area Water Trail Act (Gov. Code, §§ 66690–66694) provides for the future creation of a water trail for recreational boating around the San Francisco Bay. Plaintiffs complain the final EIR failed to identify renewal of the marine terminal lease as "inconsistent" with the act. We need not and do not decide whether the act is merely enabling legislation (as the Lands Commission and Chevron maintain), or a regional "plan" requiring attention and discussion in a CEQA review. Nor do we need to decide whether the terminal's presence in the bay truly obstructs such a water trail. Again, as we have discussed, the baseline for assessing the environmental impacts of the lease renewal project properly reflected the marine terminal's then current operative condition, which included its physical structure. Accordingly, the EIR did not need to consider impacts of that existing structure on the water trail because they were not "effects of [the] individual project" under consideration. (See § 21083, subd. (b)(2).)

---

[9] Plaintiffs also assert in passing that a hydrogen pipeline project should have been considered in a cumulative impact analysis. This project involves a pipeline originating at the refinery and transporting excess hydrogen to offsite consumers. However, plaintiffs have not identified any impact of the pipeline project the commission should have considered. Furthermore, this court has already concluded, in an earlier case, that the pipeline project is severable for CEQA purposes from a project at the refinery to improve its ability to process crude oil—let alone from the marine terminal lease renewal project at issue in this case. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 101 [108 Cal.Rptr.3d 478].)

#### e. *Land-based Bay Trail*

Local and regional plans call for construction of the Bay Trail, a multipurpose, land-based recreational trail around the San Francisco Bay. Plaintiffs complain the Lands Commission also failed to acknowledge "inconsistency" between the terminal lease renewal and Bay Trail plans.

However, the draft EIR clearly considered the issue at pages 4.5-15 to 4.5-16. It concluded the Bay Trail, if built to plan, would run through the privately owned "upland" area containing supporting facilities for the terminal—land not considered to be subject to a public trust easement and the Lands Commission's control, and land not involved in the marine terminal lease renewal project at issue here. Accordingly, the Lands Commission believed it had no authority to impose trail conditions in connection with renewal of the terminal lease. Nevertheless, the Lands Commission urged the interested parties to discuss the issue and see if they could reach some agreement to facilitate development of the trail. It thus deferred final approval of the EIR and lease renewal for a month, and the parties voluntarily entered into a side agreement whereby Chevron agreed to provide two easements across its refinery property and $2 million toward security along that portion of the trail once it is constructed.

In any case, as we have discussed, the baseline for assessing the environmental impacts of the lease renewal project properly reflected the conditions "on the ground" at the time, which included the presence of supporting facilities, such as the pipelines crossing the upland area. Accordingly, the EIR did not need to consider impacts of the existing terminal support facilities on the Bay Trail plans because these impacts were not "effects of [the] individual project," i.e., the marine terminal lease renewal, under consideration. (See § 21083, subd. (b)(2).)

#### f. *Trustee Agencies*

Citing sections 21080.4, subdivision (a), and 21104, plaintiffs contend the Lands Commission failed to "consult" with the State Coastal Conservancy (Conservancy) and California's Department of Fish and Game (Department) about the marine terminal lease renewal project.[10]

■ Section 21080.4, subdivision (a), requires a lead agency (responsible for the environmental review of a proposed project) to "send notice" to other

---

[10] Plaintiffs also cite section 21167.6.5, but make no argument concerning it. Accordingly, they have waived any issue as to this section, and we do not address it. (See *McComber v. Wells* (1999) 72 Cal.App.4th 512, 522–523 [85 Cal.Rptr.2d 376] [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "].)

responsible agencies of its intention to prepare an EIR. (§ 21080.4, subd. (a).) Plaintiffs contend both the Conservancy and the Department are "trustees" entitled to such notice. Even assuming that to be the case, the record shows the Lands Commission sent notice and a copy of the draft EIR to both.

Section 21104 requires "the state lead agency [to] consult with, and obtain comments from, each responsible agency, trustee agency, any public agency that has jurisdiction by law with respect to the project . . . ." (§ 21104.) The notice the Lands Commission sent to the Conservancy and Department asked for comments within 45 days as provided for by CEQA and its guidelines. (§ 21091, subd. (a); CEQA Guidelines, § 15105, subd. (a).) Neither the Conservancy nor the Department provided comments. CEQA Guidelines anticipate there may be no response, and therefore provide if "any public agency or person who is consulted with regard to an EIR . . . fails to comment within a reasonable time as specified by the lead agency, it shall be assumed, absent a request for a specific extension of time, that such agency or person has no comment to make." (CEQA Guidelines, § 15207.) Accordingly, there was no failure by the Lands Commission to consult with trustee agencies.

### g. *Response to Public Comments*

█ Public comments allow an agency "to identify, at the earliest possible time in the environmental review process, potential significant effects of a project, alternatives, and mitigation measures." (§ 21003.1, subd. (a).) Considering timely comments from the public on draft EIR's is a statutory obligation. (§ 21091, subd. (d)(1).) But not all comments require a response. " '[A] lead agency need not respond to each comment made during the review process, however, it must specifically respond to the most significant environmental questions presented. . . .' " (*A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1808 [16 Cal.Rptr.2d 358].) Plaintiffs complain the Lands Commission failed to respond to comments about the asserted recreational impacts we have already addressed.

To begin with, both the draft EIR (in §§ 4.5.1 and 4.5.4) and responses to comments addressed comments raising recreational and Bay Trail issues. In any case, as we have explained, these were existing conditions and not impacts the EIR for the marine terminal lease renewal project was required to discuss. Accordingly, no response to these comments was required. (See *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 487 [80 Cal.Rptr.3d 28, 187 P.3d 888] [failure to respond to "patently irrelevant" comments not prejudicial error].)

### h. *Statement of Findings and Overriding Considerations*

Finally, plaintiffs assert the Lands Commission's statement of findings and overriding considerations, adopted when it approved the lease renewal, was not supported by substantial evidence.

■ If an EIR finds a project will have significant environmental impacts, the agency responsible for the project must make a statement of findings for each impact. The agency may find (a) it has adopted changes to the project that mitigate or avoid the impact, (b) another agency has or should adopt such changes, or (c) economic, social, or other considerations make such changes infeasible. (§ 21081; *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1032 [185 Cal.Rptr. 41].) A statement of overriding considerations is required " '[i]f approval of the project will result in significant environmental effects which "are not at least substantially mitigated . . . ." ' " (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 847 [29 Cal.Rptr.2d 492], citing CEQA Guidelines, § 15093, subd. (b).) Such statement provides the agency's reasons for proceeding with the project despite its unavoidable environmental risks. (*Concerned Citizens*, at p. 847.)

Plaintiffs' argument that the Lands Commission's statement of findings and overriding considerations is inadequate is a recycled medley of their separate challenges to the final EIR, each of which we have already addressed and rejected. We therefore do not revisit these issues here. As we have discussed, the Lands Commission selected an appropriate baseline by which to assess environmental impacts of the lease renewal, and the final EIR properly addressed identified impacts of the lease renewal project and adequately addressed those impacts.

## B. *Public Trust Doctrine*

In addition to their CEQA challenge, plaintiffs contend the Lands Commission violated the public trust doctrine when it renewed the marine terminal lease. Plaintiffs do not dispute that the maintenance and operation of the terminal is a permissible public trust use. Nor do they dispute that the Lands Commission may, in its capacity as acting trustee of the public trust for the state, lease out the marine terminal facilities. Rather, plaintiffs claim that before approving the lease renewal, the Lands Commission was required to consider other public trust uses of the property, specifically recreational uses, and to mitigate impacts on those uses to the greatest extent possible. In other words, plaintiffs maintain the CEQA environmental review process was insufficient, and the Lands Commission was required, under the public trust doctrine, to undertake an additional review process and impose additional mitigation conditions. As we explain, in this case, where the Lands

Commission continued a permissible and long-standing trust use and conducted adequate review under CEQA, there was no violation of the public trust doctrine.

## 1. *Overview of the Doctrine*

 When California was admitted to the Union in 1850 it acquired ownership of all tidelands and the beds of all inland navigable waters within its borders. (*City of Berkeley v. Superior Court* (1980) 26 Cal.3d 515, 521 [162 Cal.Rptr. 327, 606 P.2d 362] (*City of Berkeley*).) The state owns these tidelands and submerged lands as trustee for public purposes, and a public easement and servitude exists over these lands for those purposes.[11] (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434 [189 Cal.Rptr. 346, 658 P.2d 709] (*National Audubon*); *Zack's, supra*, 165 Cal.App.4th at p. 1175.)

The public trust doctrine, "traceable to Roman law, rests on several related concepts. First, that the public rights of commerce, navigation, fishery, and recreation are so intrinsically important and vital to free citizens that their unfettered availability to all is essential in a democratic society. [Citation.] 'An allied principle holds that certain interests are so particularly the gifts of nature's bounty that they ought to be reserved for the whole of the populace. . . . [¶] Finally, there is often a recognition, albeit one that has been irregularly perceived in legal doctrine, that certain uses have a peculiarly public nature that makes their adaptation to private use inappropriate. The best known example is found in the rule of water law that one does not own a property right in water in the same way he owns his watch or his shoes, but that he owns only an usufruct—an interest that incorporates the needs of others. It is thus thought to be incumbent upon the government to regulate water uses for the general benefit of the community and to take account thereby of the public nature and the interdependency which the physical quality of the resource implies.' " (*Zack's, supra*, 165 Cal.App.4th at 1175–1176, fn. omitted, quoting Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention, supra*, 68 Mich. L.Rev. at pp. 484–485.)

---

[11] " 'The term "tidelands" is often used generically to cover all the state trust lands in and fronting on the ocean or the bay; but in California, where statutes distinguished various kinds of lands for purposes of disposition, it is useful to separate submerged lands—which are those always covered by water, even at low tide—from tidelands—those covered and uncovered by daily tides, that is, the lands lying between mean high-tide and mean low-tide—and from swamp and overflowed lands—those which are above mean high-tide, but subject to extreme high tides so that marsh grasses grow on them; they are commonly called marshlands.' " (*Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1175, fn. 4 [81 Cal.Rptr.3d 797] (*Zack's*), quoting Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention* (1970) 68 Mich. L.Rev. 471, 525, fn. 159.)

Accordingly, the "traditional triad" of public trust uses includes navigation, commerce, and fishing on navigable waters. (*National Audubon, supra*, 33 Cal.3d at p. 434.) Commercial uses consistent with the trust include "wharves or docks and other structures in aid of commerce." (*City of Berkeley, supra*, 26 Cal.3d at p. 522.) The Lands Commission, in turn, acting on behalf of the state, can lease tidelands and submerged lands for such uses consistent with the trust. (*Western Oil & Gas Assn. v. State Lands Com.* (1980) 105 Cal.App.3d 554, 563 [164 Cal.Rptr. 468].) Recreation and environmental preservation are also permissible public trust uses. (*National Audubon*, at pp. 434–435.)

### 2. Standard of Review

The parties dispute the standard by which we should review the Lands Commission's action. Plaintiffs focus on the commission's renewal of the marine terminal lease, maintain the renewal was a quasi-adjudicatory decision, and therefore the commission's determination to continue the existing public trust use of the bay land and waters should be reviewed under the abuse of discretion standard set forth in Code of Civil Procedure section 1094.5. That section, which provides for, and specifies the scope of judicial review in, administrative mandamus actions, applies when the underlying administrative proceeding is one "in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in" the agency. (Code Civ. Proc., § 1094.5, subd. (a).) "[T]he intent of the Legislature in enacting [Code of Civil Procedure section] 1094.5 was to authorize '. . . judicial review only of the exercise by an administrative agency of an adjudicatory or quasi-judicial function.' " (*Langsam v. City of Sausalito* (1987) 190 Cal.App.3d 871, 879 [235 Cal.Rptr. 672] (*Langsam*); see also *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 567 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*).)

The scope of judicial review of such an adjudicatory or quasi-adjudicatory decision is set forth by the statute: "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) On appeal, the Court of Appeal applies the same standard of judicial review as the trial court. (See *Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1077 [114 Cal.Rptr.2d 798] ["[o]n appeal, our function is identical to that of the trial court . . ."]; *Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 501 [210 Cal.Rptr. 788] ["the appellate court reviews the

administrative determination, not that of the superior court, by the same standard as was appropriate in the superior court"].)

Chevron focuses on the Lands Commission's decision to continue the existing public trust use, namely the maintenance and use of a marine terminal. Chevron contends the commission's choice of this trust use, rather than another, is a quasi-legislative determination subject to judicial review under the traditional mandamus statute, Code of Civil Procedure section 1085. (See *Western States, supra,* 9 Cal.4th at pp. 567–568 [quasi-legislative actions are properly challenged in traditional mandamus action under § 1085, even when agency is required to hold a hearing and take evidence]; *Langsam, supra,* 190 Cal.App.3d at p. 879 ["where an agency is exercising a quasi-legislative function, judicial review must proceed under ordinary or traditional mandamus"].)

Judicial review of agency actions that are quasi-legislative in character is under a more deferential, arbitrary and capricious standard. (See *San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 667 [42 Cal.Rptr.3d 868, 133 P.3d 1028] [applying arbitrary and capricious standard to quasi-legislative action]; *Western States, supra,* 9 Cal.4th at p. 574 [non-CEQA mandamus cases challenging quasi-legislative actions "are governed by the 'arbitrary and capricious' standard"].) Under this standard, " ' "judicial review is limited to an examination of the proceedings . . . to determine whether [the agency's] action has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether [the agency] has failed to follow the procedure and give the notices required by law." ' " (*Major v. Memorial Hospitals Assn.* (1999) 71 Cal.App.4th 1380, 1398 [84 Cal.Rptr.2d 510]; see also *Western States, supra,* 9 Cal.4th at p. 574.) Appellate review in a traditional mandamus proceeding " 'is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence.' " (*Agosto v. Board of Trustees of Grossmont-Cuyamaca Community College Dist.* (2010) 189 Cal.App.4th 330, 336 [118 Cal.Rptr.3d 300], quoting *Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352].) When, however, the appellant contends the respondent took action that is "arbitrary, capricious, contrary to public policy, unlawful, or procedurally unfair," the appellate court faces "a question of law" which is reviewed de novo. (*Personnel Com. v. Board of Education* (1990) 223 Cal.App.3d 1463, 1466 [273 Cal.Rptr. 288] ["With respect to these questions the trial and appellate courts perform essentially the same function, and the determinations of the trial court are not conclusive on appeal."]; see also *Agosto, supra,* at p. 336, quoting *Saathoff, supra,* at p. 700 [appellate review is de novo "when the case involves resolution of questions of law where the facts are undisputed"].)

We need not decide whether the Lands Commission's decision to continue a long-standing public trust use is adjudicatory or legislative in character. (But see, e.g., *Zack's, supra,* 165 Cal.App.4th at p. 1178 [" 'administration of the trust by the state is committed to the Legislature, and a determination of that branch of government made within the scope of its powers is conclusive in the absence of clear evidence that its effect will be to impair the power of succeeding legislatures to administer the trust . . .' "].) Both the "[a]buse of discretion standard" applicable in administrative mandamus under Code of Civil Procedure section 1094.5, and the arbitrary or capricious standard applicable in traditional mandamus proceedings under Code of Civil Procedure section 1085, embrace review for legal error, including procedural irregularity. Here, plaintiffs contend the Lands Commission failed to consider other public trust uses and to impose conditions mitigating impacts on those uses to the greatest extent possible—in other words, plaintiffs claim the Lands Commission failed to comply with asserted procedural requirements of the public trust doctrine. This is a legal issue subject to de novo review under both Code of Civil Procedure sections 1085 and 1094.5. (See *Vineyard, supra,* 40 Cal.4th at pp. 427 & fn. 4, 435 [concluding "we determine de novo whether the agency has employed the correct procedures . . ." in a case where appellant sought writ under both sections]; *Palmer/Sixth Street Properties, L.P. v. City of Los Angeles* (2009) 175 Cal.App.4th 1396, 1405 [96 Cal.Rptr.3d 875] ["in either case the standard of review would be the same because there are no disputed issues of fact"]; *Fry v. Saenz* (2002) 98 Cal.App.4th 256, 262 [120 Cal.Rptr.2d 30] ["whether under Code of Civil Procedure section 1085 or section 1094.5, we review questions of law de novo"].)

### 3. *Procedural Requirements*

Plaintiffs contend *National Audubon, supra,* 33 Cal.3d at page 425, imposes the procedural requirements the Lands Commission assertedly failed to heed—considering other public trust uses and imposing conditions mitigating impacts on those uses to the greatest extent possible. In *National Audubon,* the Supreme Court sought to harmonize two separate bodies of law affecting water use: California's appropriative water rights system and the public trust doctrine. The Los Angeles Department of Water and Power had purchased the private water rights in several nonnavigable streams flowing into Mono Lake and obtained permits from the State Water Resources Control Board to divert the water for public consumption in the Los Angeles basin. (*Id.* at pp. 425–429.) The department's acquisition of the private water rights and transfer and sale of the stream water, itself, was viewed as strictly a commercial use and not treated as public trust use. (See *id.* at pp. 436–437 [diversions from a nonnavigable tributary can impair the public trust "in a downstream [navigable] river or lake"], 452 [human and environmental uses of Mono Lake (navigable and downstream from the tributaries) are uses

protected by the public trust doctrine], 437, fn. 19 [court did not need to consider whether the public trust "extends for some purposes" to nonnavigable streams].) Nor did the water resources board believe, in any case, that the public trust doctrine had any application in the context of administering and granting permit approvals in connection with appropriative water rights. (*Id.* at pp. 428, 452.)

The Supreme Court observed, "the public trust doctrine and the appropriative water rights system . . . developed independently of each other" and "[e]ach developed comprehensive rules and principles which, if applied to the full extent of their scope, would occupy the field of allocation of stream waters to the exclusion of any competing system of legal thought." (*National Audubon, supra,* 33 Cal.3d at p. 445.) The court concluded both systems of law were of vital importance to the public and thus sought to reach "an accommodation which will make use of the pertinent principles of both the public trust doctrine and the appropriative water rights system." (*Ibid.*)

"[D]rawing upon the history of the public trust [doctrine] and the [appropriative] water rights system, the body of judicial precedent, and the views of expert commentators," the court arrived at several guiding principles, including that "[t]he state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (*National Audubon, supra,* 33 Cal.3d at pp. 445–446.) The court also noted that while the state may "prefer one trust use over another," it may not simply "abrogate the public trust merely by authorizing a use inconsistent with the trust." (*Id.* at pp. 439, fn. 21, 440.) The court thus concluded the water resources agency could not recognize private water rights in nonnavigable streams to the complete derogation of public trust uses in downstream navigable waters. Rather, the agency had both the authority and obligation to consider harm to the public trust when making such water allocation decisions. (*Id.* at pp. 447–448.)

Plaintiffs also rely heavily on *Carstens v. California Coastal Com.* (1986) 182 Cal.App.3d 277, 288 [227 Cal.Rptr. 135] (*Carstens*). In that case, the California Coastal Commission amended beach access conditions of a permit issued to the operators of a nuclear powerplant, including Southern California Edison (SCE), so the plant would meet safety conditions imposed by the federal Nuclear Regulatory Commission. The amendment allowed SCE to exclude the public from beach areas near the plant. (*Id.* at pp. 283–285.) The utility was also required to pay $3 million for construction of campsites at a nearby state beach park and convey to the state two nearby oceanfront parcels. (*Id.* at p. 284.) Carstens claimed the "amendment limiting access to the tidelands violat[ed] the public trust doctrine." (*Id.* at p. 288, fn. omitted.)

The Court of Appeal concluded "the Commission [had] properly exercised its duty . . . to consider the various uses of tidelands under the public trust doctrine in reaching its decision to grant the amendment." (*Carstens, supra,* 182 Cal.App.3d at p. 288.) The court explained the doctrine "does not prevent the state from preferring one trust use over another." (*Id.* at p. 289.) Further, nothing precluded "the Commission from considering commerce as well as recreational and environmental needs in carrying out the public trust doctrine." (*Ibid.*) The court pointed out the California Coastal Act of 1976 (§§ 30000–30900), itself, makes both "specific reference to the public trust doctrine and emphasizes the need to consider public safety and private property interests." (*Carstens,* at p. 290.) The act further recognizes " 'conflicts may occur between one or more policies of the [act]' " and the Legislature has " 'therefore declare[d] that in carrying out the provisions of this [act] such conflicts be resolved in a manner which on balance is the most protective of significant coastal resources.' " (*Ibid.*)

"The administrative record demonstrate[ed] the [coastal c]ommission considered the conflicting policy concerns and fashioned a compromise to address the practical realities." (*Carstens, supra,* 182 Cal.App.3d at p. 290.) No facts, said the court, supported Carstens's "claim the Commission in balancing the policy issues placed protection of coastal resources at the bottom of the list of priorities." (*Ibid.*) Rather, the coastal commission had recognized both the significance of the closure of the beach area (which markedly diminished public access and recreational use of 12 acres of beach, bluffs and canyons) and " 'the reality,' " i.e., the need for and cost of the nearly completed powerplant. (*Id.* at p. 291.) The coastal commission had also required mitigation it determined was "adequate" and made findings the plant served important public energy needs. (*Ibid.*) Accordingly, there was " 'no violation' " of the public trust doctrine or the coastal act. (182 Cal.App.3d at p. 291.)

*National Audubon* and *Carstens* are distinctly different from the case at hand. In *National Audubon, supra,* 33 Cal.3d 419, the water resources board had approved a *non*public trust use of tributary streams (the exercise of private water rights), without any consideration of, and in derogation of, public trust uses of Mono Lake. The Supreme Court was thus called upon to craft an analytical accommodation between two competing and equally important bodies of law, the appropriative water rights system and the public trust doctrine. As part of that accommodation, the court recognized the authority of the water resources board to consider, and required the board to consider, the impact of the exercise of private water rights on downstream, navigable bodies of water subject to a public trust servitude. In *Carstens, supra,* 182 Cal.App.3d 277, the coastal commission *changed* the public trust uses to which the ocean shoreline had been put, from recreational/environmental to commerce/public health and safety. Moreover, it did so acting

under the coastal act, which recognizes the coastal commission will be confronted with choosing between conflicting polices furthered by the act and directs the commission to resolve such conflicts in a way "which on balance is the most protective of significant coastal resources." (*Carstens*, at p. 290.)

Here, in contrast, the Lands Commission did not approve a nonpublic trust use in derogation of public trust uses (let alone balance the policies and dictates of the appropriative water rights system and the public trust doctrine), as was the case in *National Audubon*. Nor did the commission change public trust uses, as was the case in *Carstens*. (See also *Zack's, supra*, 165 Cal.App.4th at pp. 1179–1180 & fn. 8, 1182–1183 [discussing the "complexity" of choosing between sometimes conflicting public trust uses, observing the petitioner did not contest the city's "general power as [delegated] trustee to reallocate tidelands from one use to another that also serves trust purposes," and stating "the questions regarding such a reallocation are whether the other use would be more restricted than the present use or would elevate the interests of private parties over the public interest"].)

█ Rather, the Lands Commission simply continued the existing, long-standing public trust use of the navigable waters and submerged and partially submerged lands in question. "Ordinarily, a public trustee's decision that trust land shall be used for a specific purpose . . . stands . . . until the trustee decides to reallocate the land to some other public purpose or to dispose of it if that is congenial to the interests protected by the trust." (*Zack's, supra*, 165 Cal.App.4th at pp. 1182–1183.) Accordingly, we do not read *National Audubon* or *Carstens* as imposing on the Lands Commission, here, an obligation to evaluate the other public trust uses urged by plaintiffs, particularly since those recreational uses are to some degree incompatible with the trust use to which the navigable waters and submerged and partially submerged lands in question here have been put for over a century. (Cf. *Colberg, Inc. v. State of California ex. rel. Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 419 [62 Cal.Rptr. 401, 432 P.2d 3] [upholding power of the state to "deal with its navigable waters in any manner consistent" with its public trust interest and rejecting claims by riparian owners that bridges would significantly impact their use of the waterway].)

But even assuming some obligation to "consider" other public trust uses, neither *National Audubon* nor *Carstens* impress into the public trust doctrine any kind of procedural matrix. Yet, under plaintiffs' construction of the doctrine, the Lands Commission was required to (a) identify "other" public trust uses, (b) analyze the impact of maintaining the existing public trust use on those other uses, and (c) determine and require measures to mitigate those impacts to the greatest extent possible. No case discussing the public trust doctrine alludes to such procedural requirements. Indeed, imposing such

procedural constraints would be inconsistent with the recognition that the state is free to choose between public trust uses and that selecting one trust use "in preference to . . . [an]other cannot reasonably be said to be an abuse of . . . discretion." (*Higgins v. City of Santa Monica* (1964) 62 Cal.2d 24, 30 [41 Cal.Rptr. 9, 396 P.2d 41].)

Further, *National Audubon* and *Carstens* indicate evaluating project impacts within a regulatory scheme like CEQA is sufficient "consideration" for public trust purposes. In *National Audubon*, for example, the Supreme Court observed: "Amendments to the Water Code enacted in 1955 and subsequent years codify in part the duty of the Water Board to consider public trust uses of stream water. [Citation.] The requirements of the California Environmental Quality Act (. . . § 21000 et seq.) impose a similar obligation. (See Robie, [*Some Reflections on Environmental Considerations in Water Rights Administration* (1972)] 2 Ecology L.Q. 695.) [¶] These enactments do not render the judicially fashioned public trust doctrine superfluous. Aside from the possibility that statutory protections can be repealed, the noncodified public trust doctrine remains important both to confirm the state's sovereign supervision and to require consideration of public trust uses *in cases filed directly in the courts without prior proceedings before the board.*" (*National Audubon, supra*, 33 Cal.3d at p. 446, fn. 27, italics added.) Notably, the court did not suggest the doctrine remains relevant because it imposes protections above and beyond CEQA.

In *Carstens*, as we have observed, the Court of Appeal discussed the public trust doctrine in the context of the regulatory scheme established by the coastal act. The court pointed out that act (like CEQA) expressly makes reference to the public trust doctrine, and the court essentially made no distinction between compliance with the act and the public trust doctrine. (See *Carstens, supra*, 182 Cal.App.3d at pp. 289–291.)

*Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349 [83 Cal.Rptr.3d 588], also reflects sensitivity to the interplay between environmental review in the regulatory approval process and the mandate of the public trust doctrine. Although the court concluded a member of the public can bring suit against an agency that has allegedly acted in violation of the public trust doctrine, it also concluded abstention would have been warranted in the case before it because the agency (which had been asked to approve permits for the operation and expansion of wind farms) had been proceeding with the environmental review process required under CEQA. "Intervention by the courts [through a separate lawsuit under the public trust doctrine], other than by exercising oversight over the administrative process and ensuring that proper standards are applied, not only would threaten duplication of effort and inconsistency of results, but would

require courts to perform an ongoing regulatory role as technology evolves and conditions change." (166 Cal.App.4th at p. 1371.) In short, the plaintiffs' stand-alone public trust doctrine claim could have negatively impacted the county's "ability . . . to accomplish its policy objectives" and would have risked "the pronouncement of inconsistent standards and conditions for the operation of [wind] turbines." (*Id.* at p. 1372.) The court further concluded the plaintiffs could have, and should have, challenged the county's issuance of the conditional permit. They had not done so, and it was too late to hale the county into court to litigate issues addressed in the permitting and environmental review process. Accordingly, dismissal was also proper for lack of a necessary and indispensable party, i.e., the county. (*Ibid.*)

Here, the Lands Commission duly and properly engaged in the environmental review process required by CEQA. In invoking the public trust doctrine, plaintiffs are essentially trying to override significant provisions of that act, namely those pertaining to the baseline used to assess the environmental impacts of a proposed project, and those pertaining to project alternatives and mitigation measures. Plaintiffs have cited no case, and we are aware of none, that suggests that where no change is being made to a public trust use and there has been compliance with CEQA, the public trust doctrine independently imposes an additional impact analysis requirement and requires the consideration of additional project alternatives and mitigation measures in connection with other public trust uses.

Moreover, the CEQA review process here encompassed discussion of other public trust uses. For example, section 4.5 and comment response 4.2 of the draft EIR discussed impacts to recreational boating and other water recreational uses at and around the marine terminal and concluded the lease renewal would not have significant new impacts. During the Lands Commission's public hearings on the lease renewal on December 3, 2008, and January 29, 2009, commission representatives and members of the public also discussed these issues.

The Lands Commission also facilitated discussions in connection with plaintiffs' desire to secure significant concessions from Chevron with respect to the Bay Trail. Even though the Lands Commission did not believe it had authority to impose mitigation measures on Chevron's upland private property, over which there was no public trust servitude, the commission encouraged discussions between Chevron, the proponents of the trail and officials of the City of Richmond. These efforts resulted in Chevron agreeing to provide two mile-long easements across its upland property, and $2 million for any security measures necessary to keep trail users out of sensitive refinery areas. Accordingly, we need not decide the extent of the Lands Commission's authority. Even if it had such authority, there was no violation of the public

trust doctrine. Indeed, the accommodations Chevron made in this case for the Bay Trail are similar to the mitigation measures required of the operator of the nuclear powerplant in *Carstens*. There, SCE offered $3 million to address loss of beach access. The coastal commission additionally required dedication of two other beachfront parcels. (*Carstens, supra*, 182 Cal.App.3d at p. 284.) The Court of Appeal called the coastal commission's approval of the project an appropriate "compromise" that reflected "practical realities" and satisfied the public trust doctrine. (*Id.* at p. 290.) We reach the same conclusion here.

## III. Disposition

The judgment is affirmed.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied January 27, 2012, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied March 14, 2012, S199966. Baxter, J., and Corrigan, J., did not participate therein.